# No. 25-1349

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

**DENHAM CAPITAL MANAGEMENT LP;**
**DENHAM CAPITAL MANAGEMENT GP LLC, TAX MATTERS PARTNER,**

**Petitioners-Appellants**

**v.**

**SCOTT BESSENT,**
**Acting Commissioner, Internal Revenue Service,**

**Respondent-Appellee**

---

**ON APPEAL FROM THE DECISION OF**
**THE UNITED STATES TAX COURT**

---

**ANSWERING BRIEF FOR THE APPELLEE**

---



| | |
|---|---|
| **ELLEN PAGE DELSOLE** | **(202) 514-8128** |
| ***Court of Appeals Bar No.*** | **71201** |
| **SAMUEL P. JONES** | **(202) 616-9085** |
| ***Court of Appeals Bar No.*** | **1197266** |

***Attorneys***
***Tax Division***
***U.S. Department of Justice***
***Post Office Box 502, Washington, D.C. 20044***

## TABLE OF CONTENTS

**Page**

Table of contents .......... i
Table of authorities .......... iv
Glossary .......... xiii
Reasons why oral argument should be heard .......... xv
Jurisdictional statement .......... 1
Statement of the issues .......... 1
Statement of the case .......... 3

A. Factual Background .......... 4

1. Denham's ownership and governance .......... 4

2. Denham and its affiliated funds .......... 6

3. The individual partners' pivotal roles .......... 8

4. Denham's payments to the individual partners .......... 9

5. Denham's tax reporting .......... 10

6. The FPAAs .......... 11

B. Tax Court proceedings .......... 11

Summary of argument .......... 13
Argument:

I. Denham's computation of its partners' net earnings from self-employment is a partnership item .......... 18

Standard of review .......... 18

A. Introduction: TEFRA and partnership items .......... 19

B. Net earnings from self-employment fall within the Code and Treasury Regulation's partnership-item definition ..... 21

1. Net earnings from self-employment must be "taken into account" for Denham's taxable year ..... 21

2. Net earnings from self-employment are more appropriately determined at the partnership level ..... 26

C. The partnership-item definition's clear-cut application cannot be avoided through Denham's "entire-partnership" rule ..... 29

II. The Tax Court correctly determined that Denham's individual partners were not limited partners under §1402(a)(13) ..... 33

Standard of review ..... 33

A. Social Security and self-employed individuals ..... 33

B. Fundamental principles of federal taxation dictate the approach taken by the Tax Court ..... 36

1. Federal—not state—law controls the interpretation of a federal tax statute ..... 37

2. Federal tax law is concerned with economic realities ..... 41

3. Federal tax law should be uniform nationwide ..... 42

C. The ordinary meaning of "limited partner" in 1977 was a partner whose distributive share was of an investment nature ..... 44

1. Historically, a limited partner did not participate in the partnership's activities .......... 45

2. The statutory purpose, context, and scheme confirm this reading .......................................... 51

3. The legislative history confirms this interpretation .................................................... 54

D. The individual partners were active participants in Denham's business .................................................. 56

E. Denham's and the amici's remaining arguments lack merit ................................................................... 60

1. There is no conflict between the passive-investor standard and other Code provisions .... 60

2. IRS and SSA publications align with the Commissioner's position ..................................... 66

3. Later legislative proposals do not alter §1402(a)(13)'s plain meaning ............................. 70

4. The 1997 congressional moratorium does not undermine the Commissioner's position ............ 71

Conclusion ........................................................................................ 72

Certificate of compliance ...................................................................... 73

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*In re Adelphia Comms. Corp*,
376 B.R. 87 (Bankr. S.D.N.Y. 2007) .......... 51
*Alexander v. IRS*,
72 F.3d 938 (1st Cir. 1995) .......... 27
*Ames v. Downing*,
1 Bradf. 321 (N.Y. Sur. 1850) .......... 45
*Amoche v. Guarantee Tr. Life Ins. Co.*,
556 F.3d 41 (1st Cir. 2009) .......... 18
*Bartenwerfer v. Buckley*,
598 U.S. 69 (2023) .......... 25
*Bassing v. United States*,
563 F.3d 1280 (Fed. Cir. 2009) .......... 19
*Baylin v. United States*,
30 Fed. Cl. 248 (1993) .......... 31
*Bedrosian v. Commissioner*,
940 F.3d 467 (9th Cir. 2019) .......... 28
*Bergerson v. Life Ins. Corp. of Am.*,
170 F. Supp. 150 (D. Utah 1958), *modified on other grounds*, 265 F.2d 227 (10th Cir. 1959) .......... 48
*Boulware v. United States*,
552 U.S. 421 (2008) .......... 41
*Burke-Waggoner Oil Ass'n v. Hopkins*,
269 U.S. 110 (1925) .......... 39
*Burnet v. Harmel*,
287 U.S. 103 (1932) .......... 37, 38
*Callaway v. Commissioner*,
231 F.3d 106 (2d Cir. 2000) .......... 19, 20, 26
*Cap. Video Corp. v. Commissioner*,
311 F.3d 458 (1st Cir. 2002) .......... 18, 33
*Commissioner v. Culbertson*,
337 U.S. 733 (1949) .......... 40
*Commissioner v. Groetzinger*,
480 U.S. 23 (1987) .......... 23

**Cases (cont'd):** **Page(s)**

*Commissioner v. Tower*,
327 U.S. 280 (1946) ........................................................................39
*Cooper v. SSA*,
131 F.4th 995 (9th Cir. 2025).........................................................69
*Delaney v. Fid. Lease Ltd.*,
526 S.W.2d 543 (Tex. 1975)...........................................................48
*Dolan v. U.S. Postal Serv.*,
546 U.S. 481 (2006) ........................................................................51
*Donroy Ltd. v. United States*,
196 F. Supp. 54 (N.D. Cal. 1961) ..................................................48
*Ellsasser v. Commissioner*,
61 T.C. 241 (1973)...........................................................................35
*Exec. Hotel Assocs. v. Elm Hotel Corp.*,
245 N.Y.S.2d 929 (Civ. Ct. 1964) ..................................................48
*Foxfield Villa Assocs., LLC v. Robben*,
967 F.3d 1082 (10th Cir. 2020) ......................................................51
*Gerstenbluth v. Credit Suisse Secs. (USA) LLC*,
728 F.3d 139 (2d Cir. 2013)...........................................................67
*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) ........................................................................64
*Hardy v. Commissioner*,
T.C. Memo. 2017-16........................................................................61
*Harper v. Del. Valley Broadcasters, Inc.*,
743 F. Supp. 1076 (D. Del. 1990) ..................................................51
*Heiner v. Mellon*,
304 U.S. 271 (1938) ........................................................................40
*Hewlett-Packard Co. v. Commissioner*,
875 F.3d 494 (9th Cir. 2017) ..........................................................59
*Holzman v. Escamilla*,
86 Cal. App. 2d 858 (1948) ............................................................48
*Huff v. Commissioner*,
138 T.C. 258 (2012).........................................................................24
*Katz v. Commissioner*,
335 F.3d 1121 (10th Cir. 2003) ......................................................30
*Keener v. United States*,
551 F.3d 1358 (Fed. Cir. 2009)..............................................21, 28

**Cases (cont'd):** **Page(s)**

*Keith v. Commissioner*,
115 T.C. 605 (2000) .... 59

*Life Care Centers of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*,
79 F.3d 496 (6th Cir. 1996) .... 51

*Loper Bright Enter. v. Raimondo*,
603 U.S. 369 (2024) .... 20

*Losantiville Country Club v. Commissioner*,
906 F.3d 468 (6th Cir. 2018) .... 59

*Lyeth v. Hoey*,
305 U.S. 188 (1938) .... 37, 43, 44

*Marin TV Servs. Partners, Ltd. v. FCC*,
993 F.2d 261 (D.C. Cir. 1993) .... 51

*Marlin Broad. of Cent. Fla., Inc. v. FCC*,
952 F.2d 507 (D.C. Cir. 1992) .... 51

*Martin v. Commissioner*,
149 T.C. 293 (2017) .... 29

*Marx v. Gen. Rev. Corp.*,
568 U.S. 371 (2013) .... 64

*Mayo Found. for Med. Educ. & Rsch. v. United States*,
562 U.S. 44 (2011) .... 33

*Mellouli v. Lynch*,
575 U.S. 798 (2015) .... 53

*Monti v. United States*,
223 F.3d 76 (2d Cir. 2000) .... 21

*Moore v. United States*,
602 U.S. 572 (2024) .... 39

*Morgan v. Commissioner*,
309 U.S. 78 (1940) .... 37-38, 44, 50, 54

*Nat'l Fed. of Ind. Bus. v. Sebelius*,
567 U.S. 519 (2012) .... 42

*O'gilvie v. United States*,
519 U.S. 79 (1996) .... 70

*Pension Ben. Guar. Corp. v. LTC Corp.*,
496 U.S. 633 (1990) .... 70

**Cases (cont'd):** **Page(s)**

*Perrin v. United States*,
444 U.S. 37 (1979) .......................................................................... 44
*Plasteel Prods. Corp. v. Eisenberg*,
170 F. Supp. 100 (D. Mass. 1959), *aff'd sub nom. Plasteel Prods. Corp. v. Helman*, 271 F.2d 354 (1st Cir. 1959) .......................................................................... 48
*PPL Corp. v. Commissioner*,
569 U.S. 329 (2013) .......................................................................... 41-42
*Raymond v. Barnhart*,
214 F. Supp. 2d 188 (D.N.H. 2002) .......................................................................... 69
*Recovery Group, Inc. v. Commissioner*,
652 F.3d 122 (1st Cir. 2011) .......................................................................... 54
*Renkemeyer, Campbell & Weaver, LLP v. Commissioner*,
136 T.C. 137 (2011) .......................................................................... 57-58
*Schweiker v. Hansen*,
450 U.S. 785 (1981) .......................................................................... 69
*SEC v. Arcturus Corp.*,
928 F.3d 400 (5th Cir. 2019) .......................................................................... 51
*Skolny v. Richter*,
124 N.Y.S. 152 (App. Div. 1910) .......................................................................... 47
*Soc. Sec. Bd. v. Nierotko*,
327 U.S. 358 (1946) .......................................................................... 33
*Soroban Cap. Partners LP v. Commissioner*,
161 T.C. 310 (2023) .......................................................................... 11-12, 58, 69
*Soroban Cap. Partners LP v. Commissioner*,
T.C. Memo. 2025-52 .......................................................................... 57-58
*Stevenson v. Commissioner*,
T.C. Memo. 1989-357 .......................................................................... 68
*Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*,
943 F.3d 49 (1st Cir. 2019) .......................................................................... 41
*Sutherland v. Peterson's Oil Serv., Inc.*,
126 F.4th 728 (1st Cir. 2025) .......................................................................... 21
*Swift v. Commissioner*,
144 F.4th 756 (5th Cir. 2025) .......................................................................... 59

**Cases (cont'd):** **Page(s)**

*Tallal v. Commissioner*,
778 F.2d 275 (5th Cir. 1985) ........................................................ 22
*Tucker Anthony Realty Corp. v. Schlesinger*,
888 F.2d 969 (2d Cir. 1989) .......................................................... 51
*United States v. Pelzer*,
312 U.S. 399 (1941) ....................................................................... 42
*United States v. Woods*,
571 U.S. 31 (2013) ........................................................... 19, 30, 32
*Weber v. Commissioner*,
103 T.C. 378 (1994) ....................................................................... 59
*Weiner v. United States*,
389 F.3d 152 (5th Cir. 2004) ........................................................ 28

**Statutes:**

Internal Revenue Code (26 U.S.C.):
§162 ................................................................................ 59
§163 ................................................................................ 58
§166 ................................................................................ 58
§183 ................................................................................ 59
§212 ........................................................................... 31, 59
§461(j) ............................................................................. 64
§464(c)(1)(B) ................................................................... 65
§464(c)(2) ........................................................................ 65
§701 ................................................................................ 19
§702 ................................................................................ 19
§702(a) ............................................................................ 24
§702(a)(7) ........................................................................ 31
§703 ................................................................................ 19
§703(a) ............................................................................ 23
§703(a)(1) ........................................................................ 31
§704 ................................................................................ 19
§704(a) ............................................................................ 24
§707(c) ..................................................................... 3, 36, 61
§751(a) ............................................................................ 31
§816 ................................................................................ 59
§901(b)(1) ........................................................................ 41

**Statutes (cont'd):** **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):
§1401 ........................................................................2, 21, 34
§1402 ..............................................................2, 14, 21, 25, 34
§1402(a)...........................................................2, 22-23, 31, 34, 68
§1402(a)(1)-(2)..................................................................53
§1402(a)(3)(A) ..................................................................54
§1402(a)(3)(C) ..................................................................54
§1402(a)(10) ........................................................ 54, 63-64, 65-66
§1402(a)(10)(A) ................................................................65
§1402(a)(13)
.......................... 2-4, 13, 15, 23, 32, 36-37, 44, 51, 60-61, 67, 70-71
§1402(b).........................................................................2
§1402(c) ........................................................................22
§1403 ........................................................................2, 21, 34
§3101 ...........................................................................2
§3101(a).........................................................................33
§3102 ...........................................................................2
§3111(a).........................................................................33
§3121 ...........................................................................59
§5000A(b)(1)....................................................................42
§6031(a)......................................................................19, 24
§6211 ...........................................................................19
§6212 ...........................................................................19
§6213 ...........................................................................19
§6214 ...........................................................................19
§6215 ...........................................................................19
§6216 ...........................................................................19
§6221 ...........................................................................19
§6222(a).........................................................................20
§6223 ...........................................................................20
§6223(a)(2) ......................................................................1
§6225 ...........................................................................20
§6226 ...........................................................................20
§6226(a)(1) ......................................................................1
§6226(f)..........................................................................1
§6229 ...........................................................................28

**Statutes (cont'd):** **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):
§6230 .......... 20
§6231(a)(3) .......... 13-14, 20-21, 25, 30
§6231(a)(5) .......... 29
§6231(a)(6) .......... 20
§7482(a)(1) .......... 1
§7483 .......... 1
§7701 .......... 39

Title 6 Delaware Code Annotated (6 Del. Code Ann.):
§17-303(b) (West) .......... 63
§17-303 (West) .......... 5
§17-403 (West) .......... 5

42 U.S.C. §405(c)(2)(A) .......... 68

42 U.S.C. §411(a) .......... 68

Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584 .......... 1

Social Security Act Amendments of 1950, Pub. L. No. 81-734, 64 Stat. 477 .......... 34

Social Security Amendments of 1977, Pub. L. No. 95-216, 91 Stat. 1509 .......... 36

Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324 .......... 1

Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 .......... 64-65

Taxpayer Relief Act of 1997, Pub. L. No. 105-34, 111 Stat. 788 .......... 71

**Regulations and Regulatory Materials:** **Page(s)**

Treasury Regulations (26 C.F.R.):
§1.183-2(b) .......... 59
§1.702-1(a)(8)(i) .......... 31

**Regulations and Regulatory Materials (cont'd): Page(s)**

Treasury Regulations (26 C.F.R.) (cont'd):
§1.1401-1(a)....................................................................29
§1.1402(a)-1(b) ................................................................22
§1.1402(a)-2(d) ................................................................24
§301.6231(a)(3)-1 .........................................................14, 21
§301.6231(a)(3)-1(a)(1)(i) ..............................................26
§301.6231(a)(3)-1(a)(2) ..................................................32
§301.6231(a)(3)-1(a)(4)(i) ..............................................32
§301.6231(a)(3)-1(a)(vi)(E) ............................................31
§301.6231(a)(3)-1(b) ...................................................26, 28
§301.7701-1(a)(1) ...........................................................39

20 C.F.R. §404.1080(b)(3) ...........................................67-68

51 Fed. Reg. 13212-02 (April 18, 1986), 1986 WL 715856 ................28

Form SSA-7104 (12-2024), https://www.ssa.gov/forms/ssa-7104.pdf [https://perma.cc/4CXF-EZZJ] ........................................69

IRS, 1990 Form 1065, U.S. Partnership Return of Income, https://www.irs.gov/pub/irs-prior/f1065--1990.pdf [https://perma.cc/9WRJ-TB9Q].....................................25

IRS Field Service Advisory, 1997 WL 33313783 (Sept. 29, 1997)..........................................................................22

Rev. Rul. 75-525, 1975-2 C.B. 350, 1975 WL 34985 ..........................22

**Other Authorities:**

Legislative Materials:
143 Cong. Rec. S6694 (daily ed. Jun. 27, 1997) ...........................71
H.R. Rep. 81-1300 (1949) ........................................ 34-35, 52-53
H.R. Rep. 90-544 (1967) ...................................................66
H.R. Rep. 94-658 (1975) ...................................................65
H.R. Rep. 95-702, pt.1 (1977)..............................35-36, 55, 62, 66
Health Security Act, H.R. 3600, 103d Cong. (1993)......................70

**Other Authorities (cont'd): Page(s)**

Revised Uniform Limited Partnership Act (1976):
§303(a) .......... 49
§303(b) .......... 49
§303, Comment .......... 49

Black's Law Dictionary (Rev. 4th ed. 1968) .......... 49

Bromberg & Ribstein on Partnership, §12.14 (3d. ed. 2025-2 Supp. 2019) .......... 63

Const. art. I, §8, cl. 1 .......... 37

Const. art. VI, cl. 2 .......... 37

F. Hodge O'Neal, *Comments on Recent Developments in Limited Partnership Law*, 1978 Wash. U. L.Q. 669 (1978) .......... 49

Francis J. Troubat, *The Law of Commandatary and Limited Partnership in the United States* (1853) .......... 45-46

Harold P. Packer & George J. Leibowitz, *Coverage of the Self-Employed Under the Old-Age & Survivors Insurance Program*, 36 Calif. L. Rev. 61 (1948) .......... 33, 52

Henry Campbell Black, A Law Dictionary (2d ed. 1910) .......... 47

J. William Callison & Maureen A. Sullivan, *Partnership Law & Practice: General & Limited Partnerships* §18:1 (2025-2026) .......... 49

James Chen & Jonathan Boyar, *Profits Interest: Definition & Comparison to Capital Interest*, Investopedia (Sept. 6, 2020), https://www.investopedia.com/terms/p/profits-interest.asp [https://perma.cc/V7ER-WCF4] .......... 4

Rapalje & Lawrence, A Dictionary of American and English Law, Vol. II (1883) .......... 47

Uniform Limited Partnership Act §7 (1916) .......... 48-49

William Draper Lewis, *The Uniform Limited Partnership Act*, 65 U. Penn. L. Rev. 715 (1917) .......... 45-47

## GLOSSARY

| Abbreviation | Definition |
| --- | --- |
| ADD | Citations to Denham's addendum |
| Agreement | Denham's Fifth Amended and Restated Limited Partnership Agreement |
| APP | Citations to Denham's appendix |
| Br. | Citations to Denham's brief |
| Denham | Denham Capital Management LP |
| Denham GP | Denham Capital Management GP LLC |
| FPAA | Final Partnership Administrative Adjustment |
| Individual partners | Denham's partners Stuart Porter, Scott Mackin, Carl Tricoli, Riaz Siddiqi, and Jordan Marye |
| I.R.C. | Internal Revenue Code (26 U.S.C.) |
| IRS | Internal Revenue Service |
| MFA Br. | Citations to amicus Managed Funds Association's brief |
| POMS | SSA's Program Operations Manual System |
| RER Br. | Citations to amicus Real Estate Roundtable's brief |
| ROA | Citations to the record on appeal, as numbered and paginated by this Court |

| Abbreviation | Definition |
|---|---|
| RULPA | Revised Uniform Limited Partnership Act (1976) |
| SA | Citations to the Commissioner's supplemental appendix |
| SECA | Self-Employment Contributions Act |
| SSA | Social Security Administration |
| TEFRA | Tax Equity and Fiscal Responsibility Act of 1982 |
| Treas. Reg. | Treasury Regulations (26 C.F.R.) |
| ULPA | Uniform Limited Partnership Act (1916) |

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Counsel for the Commissioner believe that oral argument would be beneficial to the Court in this case because it presents novel and complex issues of interpretation of the Internal Revenue Code, in particular I.R.C. §1402(a)(13).

## JURISDICTIONAL STATEMENT

The IRS issued, on March 27, 2023, notices of Final Partnership Administrative Adjustment ("FPAA") for the 2016 and 2017 tax years of Denham Capital Management LP ("Denham").[1] (APP33-46.) I.R.C. §6223(a)(2). Denham Capital Management GP LLC ("Denham GP"), Denham's "tax matters partner," timely petitioned the Tax Court for readjustment. (APP12-22.) I.R.C. §6226(a)(1). The Tax Court had jurisdiction under I.R.C. §6226(f).

The Tax Court, on January 14, 2025, entered its decision sustaining the IRS's adjustments. (ADD20-21.) Denham GP timely appealed. (APP233-35.) I.R.C. §7483. This Court has jurisdiction under I.R.C. §7482(a)(1).

## STATEMENT OF THE ISSUES

Social Security is a national insurance program that provides benefits to workers to partially replace the income they lose when they

---

[1] The FPAAs were issued under the "TEFRA" procedures. *See* Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 96 Stat. 324. Congress repealed the TEFRA procedures (I.R.C. §§6221-6234) for tax years beginning in 2018. Bipartisan Budget Act of 2015, Pub. L. No. 114-74, §1101, 129 Stat. 584, 638. Unless otherwise stated, I.R.C. citations are to the version in effect in 2016 and 2017. Copies of relevant sections as then in effect are attached to Denham's brief.

retire. It is funded by taxes on employees' wages and on self-employed persons' "net earnings from self-employment." I.R.C. §§3101-3102, 1401-1403. Net earnings from self-employment include a taxpayer's distributive share of ordinary income from any trade or business carried on by a partnership of which he is a member. I.R.C. §1402(a), (b).

In 1977, Congress became troubled by schemes in which taxpayers obtained Social Security coverage—not by working—but by passively investing small sums in limited partnerships and paying small sums of self-employment tax. To correct this, Congress enacted an exclusion from self-employment income for "the distributive share of any item of income or loss of a limited partner, as such[.]" I.R.C. §1402(a)(13) ("limited-partner exception").

This correction has now created a problem on the other side of the same coin: individuals, like Denham's individual partners, evade self-employment tax by relying on their state-law "limited partner" status, despite working full-time in a partnership's business. Denham's invocation of the limited-partner exception for its individual partners raises two issues:

1. Whether the Tax Court correctly determined that the amount of net earnings from self-employment that Denham reported on its partnership tax returns was a "partnership item."

2. Whether the Tax Court correctly determined that Denham's individual partners, who performed services full-time in its business, were not limited partners under I.R.C. §1402(a)(13).

## STATEMENT OF THE CASE

On its 2016 and 2017 partnership tax returns, Denham reported its partners' net earnings from self-employment. Denham's reported net earnings from self-employment comprised "guaranteed payments" (*see* I.R.C. §§1402(a)(13), 707(c)) that Denham had made to its individual partners and Denham GP's share of Denham's ordinary income. Its reported net earnings from self-employment excluded the individual partners' shares of Denham's ordinary income, which in total exceeded $20 million each year. After an examination, the IRS increased Denham's net earnings from self-employment to include the individual partners' shares. The Tax Court sustained these adjustments and rejected Denham's claim that its individual partners' shares were exempt from self-employment tax solely because those

individuals were "limited partners" with limited liability under Delaware law. *See* I.R.C. §1402(a)(13).

### A. Factual Background

#### 1. Denham's ownership and governance

Denham is a "private equity firm" organized as a limited partnership under Delaware law. (SA.182.)

In 2016 and 2017, Denham had six partners, one of which was Denham GP, a Delaware LLC, and the rest of which were individuals: Stuart Porter, Scott Mackin, Carl Tricoli, Riaz Siddiqi, and Jordan Marye ("individual partners"). (SA.86.) Among Denham's individual partners, only Porter acquired his interest by capital contribution. (SA.53-54.) The rest received their interests through "grants of profits interest."[2] (*Id.*)

Denham's Fifth Amended and Restated Limited Partnership Agreement ("Agreement") governed its operations. Under the

[2] A "profits interest" is "an equity right based on the future value of a partnership awarded to an individual for their service to the partnership." James Chen & Jonathan Boyar, *Profits Interest: Definition & Comparison to Capital Interest*, Investopedia (Sept. 6, 2020), https://www.investopedia.com/terms/p/profits-interest.asp [https://perma.cc/V7ER-WCF4].

Agreement, Denham GP was Denham's general partner. (APP55.) As general partner, Denham GP had "unlimited liability" for Denham's "debts and obligations" and, in form, "exclusive[]" authority over Denham's "management." (APP62-63.) *See* 6 Del. Code Ann. §17-403 (West). The individual partners were limited partners under Delaware law. (APP55; SA.184-85.) As limited partners, the individual partners had liability for Denham's debts and obligations only to the extent of their capital contributions, and technically had no managerial authority. (APP62-63.) *See* 6 Del. Code Ann. §17-303 (West).

The distinction between Denham GP's exclusive managerial authority and the individual partners' lack of such authority was almost imperceptible in practice. This was because the individual partners were also members and officers of Denham GP, and thus had "exclusive power and authority" to manage its "business and affairs." (SA.25-26, 39-41.) According to Paul Winters, Denham's general counsel and officer of Denham GP, the "only" way this distinction was maintained was in the "signature block" of Denham's contracts. (SA.188-89.) Meaning, Denham GP signed agreements on Denham's behalf, but "internally *** [t]hat level of sort of specificity [didn't] exist." (SA.189.)

For example, Winters, as an officer of Denham GP, signed separation agreements on Denham's behalf with two former partners. (SA.108-19.) But Denham's individual partners made the separation decisions. (SA.229-30.)

The Agreement also required the individual partners to "devote substantially all of [their] business time and attention to the affairs of [Denham] and its affiliates[.]"[3] (APP64.) In Denham's words, the individual partners were "active Limited Partners." (SA.163.) This was true in practice. The individual partners, Winters explained, were functionally no different than employees. (SA.198.) Mackin, for instance, testified that he worked "a lot" for Denham— "easily" 55 to 70 hours a week. (SA.156-57.)

### 2. Denham and its affiliated funds

Denham carried out its "investment advisory and management services" (APP61) under "investment advisory agreements" with sector-specific "funds" (SA.207-08). (*See, e.g.*, SA.55-60.) The funds were also

[3] The Agreement allowed only Porter to "maintain other business interests and engage in other activities in addition to those relating to [Denham][.]" (APP64.)

limited partnerships, with investors holding limited-partner interests and a Denham-controlled entity serving as general partner. (APP175-78.) In 2016 and 2017, Denham advised five and seven active funds, respectively. (SA.46, 48.)

The funds invested in companies, known as "portfolio companies," in the "mining," "oil and gas," and "sustainable infrastructure" industries. (APP170, 175-76, 178.) The funds acquired controlling interests in the portfolio companies. (APP170-71.) Denham employees and the individual partners would then become "very, very actively involved" with the companies' management (SA.139), including by serving on their boards of directors (APP173).

In exchange for its services to the funds, Denham received fees under the investment-advisory agreements. (SA.51.) The fees varied among funds but, in any case, did not exceed 2% of the funds' capital. (*Id.*) In 2016 and 2017, Denham-advised funds held $7.5 billion and $8.3 billion in capital, respectively, netting Denham over $61 million and $69 million in fee income in those years, which was its sole revenue source. (SA.46, 48, 51.)

### 3. The individual partners' pivotal roles

The individual partners "guided" Denham's "overall direction" in delivering its investment-advisory services. (SA.95.) Each served in leadership roles on at least one of Denham's teams and groups responsible for originating investment opportunities, monitoring portfolio-company performance, and performing investment due-diligence. (APP216; SA.52, 95-96, 261-62.) Each also served as voting members on some or all of Denham's committees responsible for reviewing and approving investment proposals; reviewing and approving portfolio-company valuations; and making firm-wide decisions, like office expansion and employee hiring and firing. (SA.49-51, 197-98, 267.)

Apart from these roles advising the funds and managing Denham's operations, the individual partners also devoted significant time to attracting and managing fund investors. (ADD4-5.) Mackin, Tricoli, Marye, and Porter traveled extensively in 2016 and 2017 to meet with current and potential fund investors to discuss portfolio

companies and to raise capital.[4] (SA.145-46, 230-31, 244-45, 282-85.) Denham reimbursed the partners for their travel. (APP168-69.)

The individual partners' roles in managing fund investments were "big draw[s] for investors[.]" (SA.237.) Denham's investment literature prominently featured the individual partners and highlighted their "unique and complementary skills and experiences" and "significant industry relationships," among other qualities. (*E.g.*, SA.95-102.) Underscoring the individual partners' pivotal roles, investors could pull their investments if certain "Key Person Event[s]" occurred, such as the partners "fail[ing] to dedicate" sufficient time to the funds. (SA.106-07.)

#### 4. Denham's payments to the individual partners

The individual partners received from Denham a yearly salary in the form of a guaranteed payment for services (*see* SA.124), which included the value of employee benefits like a 401K contribution and commuter parking (SA.121-22). In 2017, the individual partners' scheduled guaranteed payment was $325,000. (SA.124.) The

[4] By 2017, Siddiqi had begun to "phase-out" as a Denham partner and was not traveling to meet with investors. (SA.272-74.) But he was traveling to meet with portfolio companies as the head of the "portfolio services group," which monitored company performance. (*Id.*)

guaranteed payment was paid bi-weekly. (SA.287.) Aside from Denham's claim that this amount was based on "industry practice" (APP206), nothing in the record shows how it was determined. Twenty-three lower-level Denham employees were scheduled to receive more total compensation in 2017 than the individual partners' guaranteed payments. (ADD5; SA.124.)

Along with their guaranteed payments, the individual partners received shares of Denham's ordinary income in accordance with their ownership interests. (APP227; *see* SA.120, 123.)

**5. Denham's tax reporting**

On its 2016 and 2017 partnership tax returns, Denham reported its partners' guaranteed payments and their distributive shares of ordinary income and net earnings from self-employment, among other items. (APP30-31.) The individual partners' net earnings from self-employment included their guaranteed payments but excluded their shares of Denham's ordinary income. (*Id.*) Denham also reported the aggregate net earnings from self-employment for its partners in the amounts of $1.8 million and $1.4 million (rounding up) for 2016 and 2017, respectively. (SA.4, 15.)

### 6. The FPAAs

Following an examination, the IRS issued FPAAs for Denham's 2016 and 2017 tax years, adjusting Denham's net earnings from self-employment to include the individual partners' shares of its ordinary income. (APP38-39, 45-46.) The IRS thus increased Denham's net earnings from self-employment by $27.5 million and $23 million (rounding up) for 2016 and 2017, respectively. (*Id.*)

## B. Tax Court proceedings

Denham challenged the FPAAs in Tax Court. Denham argued that the individual partners' shares of its ordinary income were exempt from self-employment tax under §1402(a)(13) because they were limited partners with limited liability under Delaware law. (*See* SA.168.) Denham also argued that, in any event, the Tax Court lacked jurisdiction to determine the amount of net earnings from self-employment reported on its partnership returns because that determination was not a "partnership item." (ROA, Vol.6, 1004-09.)

While Denham's Tax Court case was pending, the court issued an opinion in another case, *Soroban Cap. Partners LP v. Commissioner,* 161 T.C. 310 (2023), rejecting Denham's arguments. The *Soroban* court

first concluded that the limited-partner exception did "not apply to a partner who is limited in name only." *Id.* at 320. Rather, §1402(a)(13)'s text "ma[de] clear" that Congress keyed the limited-partner exception to "the nature of the [partner's] earnings," with only "passive invest[ment]" earnings falling within the exception. *Soroban*, 161 T.C. at 320-21. It held that §1402(a)(13) required a "functional analysis," focused on whether the partners' shares of partnership income "arose from" services on the partnership's behalf or "as a return on the partners' investments" in the partnership. *Soroban*, 161 T.C. at 318-19 (citations and internal quotations omitted). It also held that the net-earnings-from-self-employment determination was a "partnership item" "more appropriately determined at the partnership level." *Id.* at 324 (citations and internal quotations omitted).

Denham's case proceeded. Following a two-day trial, the Tax Court determined that the individual partners' shares of Denham's ordinary income were not exempt from self-employment tax under §1402(a)(13). (ADD1-19.) The court rejected Denham's request to revisit *Soroban*'s reasoning and applied the "functional analysis" test contemplated by *Soroban*, finding that the individual partners

"controlled nearly every aspect of" Denham's investment-advisory services—its only income-producing activity. (ADD9-19.)

## SUMMARY OF ARGUMENT

The Tax Court correctly determined that Denham's computation of its partners' net earnings from self-employment was a partnership item, and that Denham's individual partners were not "limited partners" for purposes of §1402(a)(13) such that Denham could exclude from net earnings from self-employment over $50 million in partnership income—all derived from investment-advisory services over which the individual partners exerted near total control.

1. Whether tax items are partnership items is a threshold determination in a TEFRA partnership proceeding, and the Tax Court was correct that net earnings from self-employment are such items. Denham curiously leaves this determination to the end of its brief and tersely claims the opposite. A partnership item does not turn on the meaning of "limited partner" in §1402(a)(13); it turns on the definition of "partnership item" in §6231(a)(3) (2016). And net earnings from self-employment are partnership items under §6231(a)(3)'s definition.

First, net earnings from self-employment must be "taken into account" under subtitle A of the Code (§6231(a)(3)): (i) §§1401-03, found in subtitle A, impose self-employment tax on net earnings from self-employment; (ii) §1402 hinges the net-earnings-from-self-employment determination, first, on the partnership's activities; and (iii) §1402 assigns to the partnership the responsibility to compute the partners' distributive shares of net earnings from self-employment. The IRS's longstanding requirement that partnerships report their partners' net earnings from self-employment thus follows from §1402's text.

Second, net earnings from self-employment are more appropriately determined at the partnership level under Treas. Reg. §301.6231(a)(3)-1. Net earnings from self-employment characterize the partnership's income. Such "characterization" and the "legal and factual determinations that underlie" it, like the application of §1402(a)(13), are partnership items under §301.6231(a)(3)-1, which Denham barely disputes.

Denham instead argues that net earnings from self-employment do not affect "the partnership as a whole." But this argument avoids §6231(a)(3)'s partnership-item definition, the many partnership-specific

considerations required by the net-earnings-from-self-employment characterization, and the TEFRA partnership procedures' purpose to avoid duplicative partner-by-partner proceedings.

2. The Tax Court was also correct on the merits: Denham's individual partners were not "limited partners" under §1402(a)(13). That conclusion is in keeping with fundamental principles of federal taxation; the plain language of the statute; the context, purpose, and scheme of the statute; and its legislative history.

Three fundamental principles of federal taxation support the Tax Court's interpretation: (i) federal—not state—law controls the interpretation of federal tax statutes; (ii) tax law deals in economic realities, not legal abstractions; and (iii) federal tax laws establish a uniform system of federal taxation. Denham and the amici's state-law-based approach contravenes these fundamental principles. It subjects a federal tax statute to state control, prizes legal form (limited partner with limited liability) over economic reality (active participants who controlled the business), and creates an unpredictable patchwork scheme of federal self-employment taxation dependent upon the 50 states' unique definitions of "limited partner."

The Tax Court's approach, in contrast, looks past the state-law label to the substance of an individual partner's status and activities. It asks whether, as a matter of economic reality, an individual is acting like a limited-partner investor, or like a self-employed person, generating income from his labors. That Congress intended such a uniform objective inquiry makes sense because it comports with the usual understanding of "limited partner" when Congress enacted §1402(a)(13): mere investors who are not active in the partnership's business.

From their inception until recently, limited partnerships consisted of two types of partners: general partners who actively control and conduct the business, and limited partners who passively invest capital in the business. Although that prohibition has softened over time, it remained in 1977 a defining feature of the limited partnership form.

The statutory context confirms that this traditional understanding of a limited partner was what Congress meant when it enacted §1402(a)(13). The statute closed a loophole created by the inclusion of partners' distributive shares in net earnings from self-employment without regard to their relationship to the partnership—it stopped

limited partners who invested a small amount in a business from obtaining Social Security coverage without working. The distinction between income from work (included) and income from investment (excluded) runs through §1402's self-employment-tax scheme. The Tax Court's interpretation of §1402(a)(13)—limiting it to passive investors—supports this statutory scheme and the surrounding context.

The legislative history further confirms that §1402(a)(13) is confined to passive investors. Congress identified that issue as the motivating force behind §1402(a)(13), and enacted §1402(a)(13) to exclude investment earnings from Social Security. Congress never intended that the converse be true: that individuals, like Denham's individual partners, could earn income working full-time for the partnership and still avoid self-employment tax solely through the state-law "limited partner" label.

Denham does not dispute that its individual partners controlled its investment-advisory business and were thus not passive investors. Rather, it complains that the passive-investor standard is "unworkable." But the passive-investor standard is straightforward and follows a long line of similar factor-based tests in federal tax law.

These tests focus on the substance—not form—of taxpayer transactions. The passive-investor standard is no different.

Denham's and the amici's remaining arguments are no better. They mine the Code, regulations, IRS and SSA guidance, and failed legislative and regulatory proposals for evidence that purportedly contradicts the Tax Court's interpretation. But all these sources can just as easily be read to support the Tax Court's interpretation. The point being: Denham's and the amici's arguments do not overcome §1402(a)(13)'s text and Congress's intent when it enacted the statute—to exclude from net earnings from self-employment only the income of passive investors, which Denham's individual partners indisputably are not.

## ARGUMENT

### I. Denham's computation of its partners' net earnings from self-employment is a partnership item

#### Standard of review

This Court reviews the Tax Court's jurisdiction de novo. *Cap. Video Corp. v. Commissioner*, 311 F.3d 458, 463 (1st Cir. 2002); *cf. Amoche v. Guarantee Tr. Life Ins. Co.*, 556 F.3d 41, 48 (1st Cir. 2009).

### A. Introduction: TEFRA and partnership items

A partnership pays no taxes, I.R.C. §701, but it must report its tax items, like income and losses, on an information return each year (a Form 1065), I.R.C. §6031(a). These tax items "pass through" to partners, who account for their "distributive share[s]" —as determined and reported by the partnership (on a Schedule K-1)—of these items in computing and paying their taxes. I.R.C. §§701-704.

Before TEFRA, the IRS could address a partnership's tax errors only through deficiency proceedings against individual partners (I.R.C. §§6211-16). *See Callaway v. Commissioner*, 231 F.3d 106, 107-08 (2d Cir. 2000). These proceedings were "duplicative" and risked "inconsistent treatment of partners in the same partnership." *United States v. Woods*, 571 U.S. 31, 38 (2013). TEFRA established in response "a single, unified" procedure for correcting partnership tax errors. *Id.* To that end, the TEFRA procedures "mandate[d]" that a partnership's partners "treat the same items consistently[.]" *Bassing v. United States*, 563 F.3d 1280, 1284 (Fed. Cir. 2009).

TEFRA required that the "tax treatment of any partnership item *** be determined at the partnership level." I.R.C. §6221. Partners are

bound by the partnership's "treatment" of partnership items, I.R.C. §6222(a), and any adjustments to partnership items occur in partnership-level proceedings (IRS examinations and court proceedings), I.R.C. §§6223, 6226, which then flow to the partners via "computational adjustment[s]," I.R.C. §§6225, 6230, 6231(a)(6). So "the threshold question for the application of the TEFRA procedures" —and for the Tax Court's jurisdiction—is whether a tax item is a "partnership item." *Callaway*, 231 F.3d at 108.

The Code broadly defines partnership items and empowers the IRS to further define such items. A partnership item under the Code is (1) "required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent" that (2) Treasury Regulations "provide that *** such item is more appropriately determined at the partnership level than at the partner level." I.R.C. §6231(a)(3). The reference to subtitle A reflects partnership items' breadth. Entitled "Income taxes," subtitle A spans over 1,000 sections and covers just as many topics. *See* I.R.C. §§1-1563. Section 6231(a)(3) also grants the IRS authority to "give meaning to" the term "partnership item." *Loper Bright Enter. v. Raimondo*, 603 U.S. 369,

394-95 (2024) (footnote and citation omitted); *accord Sutherland v. Peterson's Oil Serv., Inc.*, 126 F.4th 728, 738 n.5 (1st Cir. 2025). The IRS has exercised that authority in Treas. Reg. §301.6231(a)(3)-1 ("partnership-item regulation"), and Denham has not challenged it.

### B. Net earnings from self-employment fall within the Code and Treasury Regulation's partnership-item definition

#### 1. Net earnings from self-employment must be "taken into account" for Denham's taxable year

**a.** First, §6231(a)(3) is explicit that a partnership item includes "any item required to be taken into account for the partnership's taxable year under any provision of subtitle A," and subtitle A imposes the self-employment tax on net earnings from self-employment, I.R.C. §§1401-1403. Of course, net earnings from self-employment's location in the Code alone does not decide their partnership-item status. *See Keener v. United States*, 551 F.3d 1358, 1364 (Fed. Cir. 2009) (explaining that it would "make[] little sense" to "categorically exclude[]" as a partnership item "anything in subtitles B-J"). But net earnings from self-employment's location in subtitle A removes any doubt that they fit with items that Congress envisioned would fall under partnership proceedings. *Cf. Monti v. United States*, 223 F.3d 76,

82 (2d Cir. 2000) (location in subtitle F supports conclusion that item was *not* a partnership item).

**b.** Second, §1402(a) makes net earnings from self-employment contingent on the partnership's activities. Net earnings from self-employment include a partner's "distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business *carried on by a partnership* of which he is a member[.]" I.R.C. §1402(a) (emphasis added); *see* I.R.C. §1402(c). That is, net earnings from self-employment depend first on whether the *partnership* is engaged in a trade or business, not the partner. Treas. Reg. §1.1402(a)-1(b); Rev. Rul. 75-525, 1975-2 C.B. 350, 1975 WL 34985.[5] Although not disputed here, this is a *partnership*-level determination (*e.g.*, *Tallal v. Commissioner*, 778 F.2d 275, 276 (5th Cir. 1985)) that asks whether the partnership is "involved in [an] activity with continuity and regularity," and whether its "primary purpose for

[5] *See* IRS Field Service Advisory, 1997 WL 33313783 (Sept. 29, 1997) ("characterization of an item of income as income from self-employment" is a partnership item because the determination of whether income "arose from the trade or business of the partnership *** can be made by examining only the activities of the partnership") (emphasis in original).

engaging in the activity" is "income or profit," *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987).

**c.** Third, §1402(a) directs partnerships to compute their partners' net earnings from self-employment, including by applying any relevant exceptions. Section 1402(a) defines "net earnings from self-employment" to include a partner's "distributive share" of partnership income or loss. It then states: "except that *in computing* *** such distributive share of partnership ordinary income or loss" that is net earnings from self-employment, a list of items shall be "excluded," "not [] allowed," "allowed," or applied. I.R.C. §1402(a) (emphasis added). This list includes the limited-partner exception, which starts: "there shall be excluded the distributive share of any item of income or loss of a limited partner[.]" I.R.C. §1402(a)(13). Thus, §1402(a) requires that a partner's distributive share of net earnings from self-employment be "comput[ed]," and that computation involves subtracting income subject to the limited-partner exception.

Partnerships compute the distributive shares of their partners—a point Denham acknowledges (Br.53). Using the same verb as §1402(a), §703(a) requires that a partnership "compute[]" its "taxable income" "in

the same manner as *** an individual," but also "separately state[]" "the items described in section 702(a)." Section 702(a), in turn, enumerates items, the "distributive share" of which "each partner" must "separately" "take into account" "[i]n determining his income tax." *See* I.R.C. §704(a) (share generally determined by partnership agreement); Treas. Reg. §1.1402(a)-2(d) ("An individual's distributive share of" net earnings from self-employment "shall be determined as provided in section 704[.]"). These provisions require the partnership to compute its own taxable income and its partners' distributive shares of such income and other items. Reinforcing this point, §6031(a) requires that partnerships "include in [their] return[s] *** the individuals who would be entitled to share in [partnership] taxable income if distributed and the amount of the distributive share of each individual." Courts routinely recite the requirement that partnerships "report[] the partners' distributive shares of the partnership's income, deductions, and other tax items." *E.g., Huff v. Commissioner*, 138 T.C. 258, 263 (2012) (citations omitted).

In sum, by predicating net earnings from self-employment on the partnership's trade or business and by requiring a computation of a

partner's distributive share of net earnings from self-employment, §1402 allocates responsibility for the net-earnings-from-self-employment determination to the partnership. *Cf. Bartenwerfer v. Buckley*, 598 U.S. 69, 76 (2023) ("context can confine a passive-voice sentence to a likely set of actors") (citation omitted). Said differently, net earnings from self-employment are items that the partnership must "take[] into account" under subtitle A. I.R.C. §6231(a)(3).

The IRS's administrative practice tracks §1402's clear direction. For as far back as Forms 1065 are publicly available, they have required partnerships to report partners' distributive shares of net earnings from self-employment. *E.g.*, IRS, 1990 Form 1065, U.S. Partnership Return of Income, https://www.irs.gov/pub/irs-prior/f1065--1990.pdf [https://perma.cc/9WRJ-TB9Q].[6] This underscores—rather than undermines—the Tax Court's conclusion that net earnings from self-employment are partnership items, contrary to Denham's claims (Br.56). The IRS's—at minimum—35-year requirement that

[6] Going back even further, the 1978 Form 1065 in the record also requires partnerships to report their partners' net earnings from self-employment. (APP116 (line 9).) The Form 1065 instructions further provide a worksheet for partnerships to compute their partners' net earnings from self-employment. (ROA, Vol.4, 435, 487.)

partnerships report their partners' distributive shares of net earnings from self-employment simply reflects §1402's plain language.

**2. Net earnings from self-employment are more appropriately determined at the partnership level**

**a.** Under the Treasury Regulations, "partnership items" include "[t]he partnership aggregate and each partner's share of *** [i]tems of income, gain[,] loss, deduction, or credit of the partnership[.]" Treas. Reg. §301.6231(a)(3)-1(a)(1)(i). These top-level partnership items—income, gain, loss, deduction, or credit—also incorporate "the determination" of those items' "amount, timing, and characterization." *Id.* §(b); *see id.* (listing examples of such determinations). This follows from the rule of consistency: a "partner's distributive share of any partnership item must be reported in the same manner as on the partnership's information return" — "it must have the same amount, the same characterization, the same timing[]." *Callaway*, 231 F.3d at 108-09 (citations omitted). Drilling down further, the regulations specify that "the legal and factual determinations that underlie" the amount, timing, and character determinations are also partnership items. Treas. Reg. §301.6231(a)(3)-1(b).

A partnership's computation of net earnings from self-employment fits neatly within the partnership-item regulation. The net-earnings-from-self-employment determination is a "characterization" of the partnership's income—it distinguishes income that is net earnings from self-employment from income that is not, with different tax consequences attaching to such characterization. *See, e.g.*, *Alexander v. IRS*, 72 F.3d 938, 942 (1st Cir. 1995) ("characterization of the settlement proceeds" determines "proper tax treatment"). As explained above, the Code tasks the partnership with making that characterization and with computing the amount subject to that characterization: first, by determining whether it is engaged in a "trade or business"; and second (in this case), by determining whether its partners are limited partners in that business. And these underlying "legal and factual determinations" are also partnership items.

**b.** Denham offers only two counters to this straightforward application of the partnership-item regulation. Neither is persuasive.

First, it argues that the regulation does not separately list "net earnings from self-employment." (Br.49.) But this argument proves too much. The period of limitations for assessing tax attributable to

partnership items (I.R.C. §6229) is not listed as a partnership item, but "every [] circuit court to consider this issue" has found such period of limitations to be a partnership item. *Bedrosian v. Commissioner*, 940 F.3d 467, 471 (9th Cir. 2019) (collecting cases). And two of those courts grounded their decisions in the regulation's instruction to include among partnership items "'the *legal and factual determinations* that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, etc.'" *Keener*, 551 F.3d at 1362-63 (emphasis in original) (quoting Treas. Reg. §301.6231(a)(3)-1(b)); *Weiner v. United States*, 389 F.3d 152, 157 (5th Cir. 2004).

Denham next claims that the partnership-item regulation's "legal-and-factual-determinations" provision is limited to "'items that affect the computation of partnership taxable income.'" (Br.55 (quoting 51 Fed. Reg. 13212-02 (April 18, 1986), 1986 WL 715856).) This supposed limitation is based on the IRS's response to a comment in its notice promulgating the partnership-item regulation. *Id.* By resorting to drafting history, Denham elides the regulation's text that captures the computation of net earnings from self-employment. And whatever the meaning of the IRS's response to a single commenter, Denham's

atextual limitation is illusory: net earnings from self-employment *do* affect the computation of partnership taxable income. Whether partnership income is net earnings from self-employment determines how much of that income is subject to self-employment tax payable by partners.[7] *See Martin v. Commissioner*, 149 T.C. 293, 305 (2017) ("Self-employment tax is assessed and collected as part of the income tax[.]"); Treas. Reg. §1.1401-1(a) (same).

### C. The partnership-item definition's clear-cut application cannot be avoided through Denham's "entire-partnership" rule

Denham's remaining retort is that net earnings from self-employment are irrelevant to "the partnership as a whole." (Br.49-52, 56-57.) According to Denham, changes to net earnings from self-employment affect only individual partners and therefore must be determined in partner-level proceedings. But Denham's "entire-

---

[7] Of course, the computation of self-employment tax that an individual partner owes on his net earnings from self-employment is *not* a partnership item. That computation is an "affected item" —an "item to the extent [it] is affected by a partnership item." I.R.C. §6231(a)(5). In other words, the partnership item here is Denham's income that is net earnings from self-employment; the affected item is the self-employment tax owed on net earnings from self-employment, from Denham and any other source. The latter is a partner-level determination.

partnership" rule ignores partnership item's statutory definition; misconstrues the net-earnings-from-self-employment determination's partnership-specific considerations; and flips the TEFRA procedures on their head by compelling duplicative partner-by-partner proceedings.

To start, Denham's focus on the impacts on "the partnership as a whole" neglects the Code's definition of partnership items. To be sure, partnership items often affect the entire partnership. *Woods*, 571 U.S. at 39. But Denham's entire-partnership rule is not the statutory test for deciphering a partnership item. *See Katz v. Commissioner*, 335 F.3d 1121, 1129 (10th Cir. 2003) ("There may be sound policy reasons for not requiring a *** partnership-level proceeding when an alleged error in one partner's return affects only one other taxpayer rather than all the partners. But *** the law is otherwise.") The test asks whether an item must be taken into account for the partnership's taxable year under the Code and whether the Treasury Regulations prescribe that such item is more appropriately determined at the partnership level. I.R.C. §6231(a)(3). That test is satisfied here. (*Supra* pp.21-29.)

Nor are net earnings from self-employment unique among partnership items simply because they affect some partners differently.

Taking from Denham's example (Br.50-51), only an "individual" can deduct certain "production of income" expenses under I.R.C. §212; a corporation cannot. Yet a partnership must separately state on its return "nonbusiness expenses as described in section 212." Treas. Reg. §1.702-1(a)(8)(i); *see* I.R.C. §§702(a)(7), 703(a)(1). The partnership's characterization of such expenses controls and is a partnership item. *Baylin v. United States*, 30 Fed. Cl. 248, 253 & n.8 (1993). Similarly, I.R.C. §751(a) affects the character of a partner's gain upon the sale of a partnership interest but may have no effect on the partnership or any other partner. Nevertheless, §751(a)'s application is a partnership item. Treas. Reg. §301.6231(a)(3)-1(a)(vi)(E).

What's more, the net-earnings-from-self-employment characterization—including §1402(a)(13)'s application—is not partner-centric. The limited-partner exception analyzes the partners' relationship to the partnership and its business. While that analysis includes partner-specific facts, it also requires scrutiny of partnership-specific facts and other, specifically enumerated partnership items: the nature of the partnership's business (I.R.C. §1402(a)); how the partnership generates income; the guaranteed payments made by the

partnership to its partners (I.R.C. §1402(a)(13); Treas. Reg. §301.6231(a)(3)-1(a)(2)); and the partners' capital contributions to the partnership (Treas. Reg. §301.6231(a)(3)-1(a)(4)(i)). These considerations are "relevant to the partnership as a whole." *Woods*, 571 U.S. at 39 (citations omitted).

Finally, Denham's proposed partner-by-partner approach flouts TEFRA's purpose. The TEFRA procedures were enacted to end the duplicative partner-by-partner proceedings that produced inconsistent results for partners of the same partnership. *Woods*, 571 U.S. at 38. Nowhere does Denham claim that its individual partners' roles in its business were different such that the limited-partner exception would apply to some partners and not others. Denham's proposed approach thus results in five judicial proceedings with indistinguishable facts and legal issues, but potentially inconsistent results for partners of the same partnership. This is the opposite of what TEFRA envisioned and is not required by the Code or the Treasury Regulations.

## II. The Tax Court correctly determined that Denham's individual partners were not limited partners under §1402(a)(13)

### Standard of review

This Court reviews de novo the Tax Court's interpretation of §1402(a)(13). *See Cap. Video Corp.*, 311 F.3d at 463.

### A. Social Security and self-employed individuals

The Social Security Act and related legislation establish "a comprehensive national insurance system that provides benefits for retired workers, disabled workers, unemployed workers, and their families." *Mayo Found. for Med. Educ. & Rsch. v. United States*, 562 U.S. 44, 48 (2011). Among Social Security's broad remedial purposes is providing "for the decent support of elderly workmen who have ceased to labor." *Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358, 364 (1946).

Social Security originally did not cover self-employed individuals due to the "administrative impracticability" of determining their income and collecting contributions. *See generally* Harold P. Packer & George J. Leibowitz, *Coverage of the Self-Employed Under the Old-Age & Survivors Insurance Program*, 36 Calif. L. Rev. 61, 61-62 (1948). So Social Security was first funded only through a tax on wages that employers pay employees (now codified at I.R.C. §§3101(a), 3111(a)).

In 1950, Congress added coverage for the self-employed, Social Security Act Amendments of 1950 ("1950 Act"), Pub. L. No. 81-734, §104(a), 64 Stat. 477, 502-04, and "reaffirm[ed] the basic principle [of] a contributory system of social insurance" — "in which both contributions and benefits are directly related to the individual's own productive efforts," H.R. Rep. 81-1300, at 2 (1949). Congress also added a new funding mechanism in the form of a tax on self-employment income. 1950 Act, §208(a), 64 Stat. at 540-43 (Self-Employment Contributions Act ("SECA")) (now codified at I.R.C. §§1401-1403). In extending Social Security to the self-employed, Congress intended "self-employment income [to be] taken into account for benefit purposes to the same extent as wages[.]" H.R. Rep. 81-1300, at 10.

The 1950 Act defined "net earnings from self-employment" (now codified at I.R.C. §1402(a)) to mean: "the gross income derived by an individual from any trade or business carried on by such individual *** plus his distributive share (whether or not distributed) of income or loss *** from any trade or business carried on by a partnership of which he is a member[.]" 1950 Act, §208(a), 64 Stat. at 541. This definition encompassed a self-employed partner's distributive share of income

"derived by the partnership from carrying on a trade or business *** irrespective of the nature of his membership, as for example, as a limited or inactive member." H.R. Rep. 81-1300, at 137. So even limited or inactive partners had to pay self-employment tax on their distributive shares of a partnership's ordinary trade or business income. *Ellsasser v. Commissioner*, 61 T.C. 241, 243-49 (1973).

This changed in 1977, when Congress became "increasingly concerned about" the "solicit[ation] [of] investments in limited partnerships as a means for an investor to become insured for social security benefits." H.R. Rep. 95-702, pt.1, at 40-41 (1977). Because net earnings from self-employment included any individual partner's distributive share of partnership ordinary business income, an uncovered individual could invest a small sum in a limited partnership, perform no services for the partnership, and still obtain Social Security coverage. This concerned Congress because "the investor in the limited partnership performs no services for the partnership," and the resulting Social Security coverage was "based on income from an investment." *Id.* at 41. This was "inconsistent with the basic principle of the social

security program that benefits partially replace lost earnings from work." *Id.*

Accordingly, Congress excluded from the "net earnings from self-employment" definition the distributive share of income or loss of a "limited partner." Social Security Amendments of 1977, Pub. L. No. 95-216, §313(a), (b), 91 Stat. 1509, 1535-36. Consistent with Congress's concerns, this change was meant "to exclude for coverage purposes certain earnings which are basically of an investment nature." H.R. Rep. 95-702, at 11.

This case is about that exception's interpretation:

> there shall be excluded the distributive share of any item of income or loss of a limited partner, as such, other than guaranteed payments described in section 707(c) to that partner for services actually rendered to or on behalf of the partnership to the extent that those payments are established to be in the nature of remuneration for those services[.]

I.R.C. §1402(a)(13).

### B. Fundamental principles of federal taxation dictate the approach taken by the Tax Court

Three foundational principles of federal tax law support the Tax Court's approach and undermine Denham and the amici's state-law-based approach. First, federal—not state—law controls the

interpretation of federal tax statutes. Second, federal tax law is concerned with economic realities, not labels. Third, federal tax law should be uniform nationwide.

### 1. Federal—not state—law controls the interpretation of a federal tax statute

Federal law governs federal tax statutes. *See* Const. art. I, §8, cl. 1 (taxing power) & art. VI, cl. 2 (supremacy clause). Congress's choices in the tax arena are "not subject to state control." *Burnet v. Harmel*, 287 U.S. 103, 110 (1932). Rather, "the will of Congress [] controls[.]" *Id.* And the interpretation of a term "within the meaning of the federal statute necessarily is a federal question." *Lyeth v. Hoey*, 305 U.S. 188, 194 (1938). Thus, while state law may "create[] legal interests and rights," federal law determines the federal tax consequences, "no matter what name is given to the interest or right by state law." *Morgan v. Commissioner*, 309 U.S. 78, 80-81 (1940).

Denham acknowledges this point and correctly says that "[f]ederal tax law governs" the meaning of "limited partner" in §1402(a)(13). (Br.35-37.) But the definition it advocates— "partners of limited partnerships with limited liability for partnership obligations" (Br.37)—makes federal tax consequences wholly dependent on state-law labels

because state law determines whether partners have limited liability (Br.22-31). Denham's circular definition is wrong as a textual matter (*infra* pp.44-56), and it makes federal tax law "subject to state control," *Burnet*, 287 U.S. at 110.

*Morgan* refutes Denham's reasoning and illustrates the general principle of federal tax-law supremacy. There, the Court determined whether a power of appointment was "general" under the federal estate tax statute. *Morgan*, 309 U.S. at 79 & n.1. Although the federal statute did not define "general power of appointment," the Court held that "when it used the adjective 'general[,]'" Congress must have had in mind "the distinction usually made between a general and a special power[.]" *Id.* at 81. Because the disputed power's characteristics aligned more closely with that usual understanding of a "general" power, the Court rejected the taxpayer's argument that the power was "special" because the relevant state statute defined it as special. *Id.* at 80-82. It held that the power was "general within the intent of the Revenue Act, notwithstanding [that it] may be classified as special by the law of Wisconsin." *Id.* at 80.

Federal law also governs an entity's classification as a corporation, trust, or partnership for federal tax purposes. *See* I.R.C. §7701; Treas. Reg. §301.7701-1(a)(1). Courts have long recognized this principle. In the federal income tax's early days, the Supreme Court held that an unincorporated association, which state law deemed a partnership, was—for federal tax purposes—an "association" taxed as a "corporation." *Burke-Waggoner Oil Ass'n v. Hopkins*, 269 U.S. 110, 111-14 (1925). The Court explained that state law was not of "legal significance" in analyzing Congress's power to tax the entity as a corporation. *Id.* at 114. The Court recently reiterated that principle:

> Neither the conception of unincorporated associations prevailing under the local law, nor the relation under that law of the association to its shareholders, nor their relation to each other and to outsiders, is of legal significance as bearing upon the power of Congress to determine how and at what rate the income of the joint enterprise shall be taxed.

*Moore v. United States*, 602 U.S. 572, 585 (2024) (quoting *Burke-Waggoner*, 269 U.S. at 114).

This is true for partnerships. Every state has its own definition of "partnership" and "partner," but those state-law labels are not controlling for federal tax purposes. *E.g.*, *Commissioner v. Tower*, 327

U.S. 280, 286-88 (1946); *Commissioner v. Culbertson*, 337 U.S. 733, 738-48 (1949).

It is also true for an individual's status vis-à-vis a particular entity, like a partnership. In *Heiner v. Mellon*, for example, the Supreme Court considered whether two individuals owed income tax on their distributive shares as partners in two partnerships. 304 U.S. 271, 277-79 (1938). The partnerships were dissolved by law when a third member died, but the survivors continued to operate the business. *Id.* at 277. They argued that, upon dissolution, they were "liquidating trustees" under Pennsylvania law, which would have led to different federal tax consequences. *Id.* at 278-79. The Court rejected the taxpayers' argument because they were "not trustees within the meaning" of the Code. *Id.* at 279. "The fact that they may be so denominated by [Pennsylvania] law" was "not conclusive" because "[i]t is well settled that in the interpretation of the words used in a federal revenue act, local law is not controlling[.]'" *Id.* The Court thought it "clear" that—under the Code—the disputed income was from a "partnership 'carrying on a business[.]'" *Id.*

### 2. Federal tax law is concerned with economic realities

Federal tax law further "require[s] courts to look beyond how [] parties label, or structure, themselves. Courts must rather look to the substance of the relationships." *Sun Cap. Partners III, LP v. New England Teamsters & Trucking Indus. Pension Fund*, 943 F.3d 49, 57-59 (1st Cir. 2019) (citations omitted). In other words, "tax classifications" turn on the "'objective economic realities of a transaction,'" not "'the particular form the parties employed.'" *Boulware v. United States*, 552 U.S. 421, 429 (2008) (citation omitted). It is a "black-letter principle that 'tax law deals in economic realities[.]'" *PPL Corp. v. Commissioner*, 569 U.S. 329, 340 (2013) (citation omitted).

*PPL* is instructive. That case asked whether a "windfall tax" imposed by a foreign country was creditable under I.R.C. §901(b)(1), which provides that "any 'income, war profits, and excess profits taxes' paid overseas are creditable against U.S. income taxes." *PPL Corp.*, 569 U.S. at 331. The Court held that "the way a foreign government characterizes its tax is not dispositive with respect to the U.S. creditability analysis." *Id.* at 335. Rather, "the crucial inquiry is the tax's economic effect." *Id.* The Court held that the windfall tax was in

"substance *** that of an income tax in the U.S. sense" based on its "economic effect[.]" *Id.* at 337, 339.

Similarly, when considering the constitutionality of the Affordable Care Act's "shared responsibility payment," the Supreme Court held that it was a "tax" even though the Act itself labeled it a "penalty." *Nat'l Fed. of Ind. Bus. v. Sebelius*, 567 U.S. 519, 563-64 (2012) ("*NFIB*"); *see* I.R.C. §5000A(b)(1). The Court held that the "label" (penalty) did not control. *NFIB*, 567 U.S. at 564. Rather, the Court employed a "functional approach" that "disregard[ed] the designation of the exaction, and view[ed] its substance and application." *Id.* at 565 (citations and brackets in original omitted).

Here, the relevant question is not whether the individual partners are labeled as limited partners under Delaware law, but whether they are, in substance, functioning as limited partners as Congress understood the term when it enacted §1402(a)(13).

### 3. Federal tax law should be uniform nationwide

Federal tax laws are read "to establish a nationwide scheme of taxation uniform in its application." *United States v. Pelzer*, 312 U.S. 399, 402-03 (1941). But the approach pressed by Denham and the amici

would do the opposite—it would create a patchwork self-employment-taxation scheme dependent on the unique definitions of "limited partner" under the 50 states' laws, which may vary (and historically have varied) across state borders and across time.

As *Lyeth* explained, such a disjointed, state-law-based approach to federal taxation should be avoided. That case involved whether property received by a taxpayer from an estate to settle his claim as an heir of the estate was taxable income. *Lyeth*, 305 U.S. at 189. Whether property received under an agreement settling a probate dispute was "acquired by inheritance" (and thus exempt from taxation) had been answered differently by state courts, and the lower court had applied the law of the state where the property was received. *Id.* at 191-93. But the Supreme Court held that that was error because "the construction of the exemption in the federal statute is not determined by local law." *Id.* at 193. Because the Code "should be interpreted 'so as to give a uniform application to a nation-wide scheme of taxation[,]'" the meaning of "acquired by inheritance" "should not be decided in one way in the case of an heir in" one state "and in another way in the case of an heir" in a different state. *Id.* at 194 (citation omitted).

That is what the Tax Court's functional test for applying §1402(a)(13) avoids. It looks past the state-law label and examines the substance of an individual partner's status and activities. It adheres to the principle that federal taxation concerns substance, and provides a "uniform rule" that is not "decided in one way in the case of" a limited partner in one state "and in another way in the case of" a limited partner in a different state, "according to the differing views of the state courts" or legislatures. *Lyeth*, 305 U.S. at 194. It asks whether, as a matter of objective economic reality, an individual is acting like a limited partner in the sense intended by Congress. And that objective inquiry comports with the "usual" understanding of the term "limited partner" in 1977, when Congress enacted §1402(a)(13).

### C. The ordinary meaning of "limited partner" in 1977 was a partner whose distributive share was of an investment nature

With these principles in mind, it remains for this Court to determine what Congress meant by "limited partner, as such" when it enacted §1402(a)(13). This Court, like the Supreme Court in *Morgan*, should look to the "usual" understanding of that term at the time. *Accord Perrin v. United States*, 444 U.S. 37, 42 (1979). Denham argues

(Br.25-26) that the ordinary meaning of "limited partner" in 1977 was "a partner of a limited partnership—a state-law entity with general and limited partners—whose liability for partnership obligations is limited to his partnership investment." But Denham tells only half the story. It omits that limited partners were passive investors who had no active role in the partnership's business. It was that aspect of limited partnership that Congress had in mind when it enacted §1402(a)(13).

#### 1. Historically, a limited partner did not participate in the partnership's activities

The limited partnership traces to the Middle Ages. William Draper Lewis, *The Uniform Limited Partnership Act*, 65 U. Penn. L. Rev. 715, 716-17 (1917) ("Lewis"). It developed as a form for someone with capital to invest and reap commerce's benefits without "'engag[ing] directly'" in commerce. *Id.* at 717 (quoting *Ames v. Downing*, 1 Bradf. 321 (N.Y. Sur. 1850)). Under the French and Italian precursors to the American limited partnership, "the business [was] vest[ed] in the general partner, who possesse[d] the mastership, the exclusive and entire use of the *money* or *other property* intrusted to him, and of the business committed to his care." Francis J. Troubat, *The Law of Commandatary and Limited Partnership in the United States*, 34-36, 38

(1853) ("Troubat") (emphasis in original). On the other hand, the "special partner [was] *** merely the *creditor* of the capital which he ha[d] contributed,—sharing*** simply, in the gains or losses of the concern[.]" *Id*. at 38 (emphasis in original).

Following those early forms, limited partnerships were adopted in the United States in 1822. Lewis, 716. To obtain limited liability under the early state statutes, a limited partner was required to "refrain[] from participation in the conduct of the business." *Id.* at 720. "[O]n any participation in the conduct of his business[,]" a limited partner "los[t] his privilege of limited liability, and bec[ame], as far as those dealing with the business [were] concerned, in all respects, a partner." *Id.*

Summarizing the early law of several states, Troubat wrote that a limited partner "shall not transact any business on account of the partnership, nor be employed for that purpose as agent, attorney, or otherwise. If he shall interfere contrary to these provisions, he shall be deemed a general partner." Troubat, 313. Thus, from the start, the American limited partnership was one in which the limited partner "so far as concerns his relations to his general partners, [was] treated as a

mere contributor of capital[.]" *Skolny v. Richter*, 124 N.Y.S. 152, 157 (App. Div. 1910).

Reflecting this consensus, Black's Law Dictionary then defined a "limited partnership" as a:

> partnership consisting of one or more general partners, jointly and severally responsible as ordinary partners, *and by whom the business is conducted*, and one or more special partners, contributing in cash payments a specific sum as capital to the common stock, and who are not liable for the debts of the partnership beyond the fund so contributed.

Henry Campbell Black, A Law Dictionary, 877 (2d ed. 1910) (emphasis added); *accord* Rapalje & Lawrence, A Dictionary of American and English Law, Vol. II, 932 (1883).

While this strict prohibition has since changed, it remained in 1977 a defining feature of the limited partnership that limited partners refrained from controlling or conducting the business. Beginning in 1916, for example, the Conference of Commissioners on Uniform State Laws promulgated a Uniform Limited Partnership Act ("ULPA"), with the intent that a limited partner be able to "invest his money in a business for a share in the profits *** with the same sense of security from the possibility of unlimited liability as the subscribers to the shares of a corporation." Lewis, 715, 723.

Under the ULPA, a limited partner became liable as a general partner if he "[took] part in the control of the business." ULPA §7 (1916). Cases applying that provision held the same: "an individual [cannot] exercise control over the business *** while at the same time participating as an investor *** without subjecting [] himself *** to liability as a general partner." *Plasteel Prods. Corp. v. Eisenberg*, 170 F. Supp. 100, 103 (D. Mass. 1959), *aff'd sub nom. Plasteel Prods. Corp. v. Helman*, 271 F.2d 354 (1st Cir. 1959).[8] To be sure, other cases in that era held that some limited-partner participation did not amount to control sufficient to destroy their limited liability. (RER Br.13-15 (collecting three cases).) But none allowed a state-law limited partner to exercise the degree of control and participation exercised by Denham's individual partners.

A Revised Uniform Limited Partnership Act ("RULPA") was published in 1976, but not adopted by any state until 1979 (and then by

---

[8] *Accord, e.g., Delaney v. Fid. Lease Ltd.*, 526 S.W.2d 543, 545 (Tex. 1975); *Exec. Hotel Assocs. v. Elm Hotel Corp.*, 245 N.Y.S.2d 929, 933 (Civ. Ct. 1964); *Donroy Ltd. v. United States*, 196 F. Supp. 54, 57 (N.D. Cal. 1961); *Bergerson v. Life Ins. Corp. of Am.*, 170 F. Supp. 150, 159 (D. Utah 1958), *modified on other grounds*, 265 F.2d 227 (10th Cir. 1959); *Holzman v. Escamilla*, 86 Cal. App. 2d 858, 859-60 (1948).

only three). J. William Callison & Maureen A. Sullivan, *Partnership Law & Practice: General & Limited Partnerships* §18:1 n.6 (2025-2026). Although the RULPA further softened the restrictions on control by limited partners (*see* RULPA §303(b)), it still "carrie[d] over the basic test from former Section 7," RULPA §303, Comment. Under the RULPA, a limited partner remained generally liable for the limited partnership's obligations "if the limited partner's participation in the control of the business is *** substantially the same as the exercise of the powers of a general partner." RULPA §303(a). As one contemporary commentator observed: "The limited partnership *** is designed to allow passive investors in an enterprise to share profits without becoming responsible for losses or liabilities beyond the amount they invest in the business." F. Hodge O'Neal, *Comments on Recent Developments in Limited Partnership Law*, 1978 Wash. U. L.Q. 669, 669 (1978). And Black's at that time continued to define a limited partnership in the same way as it had before, distinguishing general partners as those "by whom the business is conducted." Black's Law Dictionary, 1277 (Rev. 4th ed. 1968).

Congress, of course, was not bound by the "control test" or any other aspect of state law, nor did it necessarily incorporate it, when it enacted the exemption from self-employment tax for "limited partners, as such." (*See supra* pp.36-44.) But this discussion shows that, at that time, it was commonly understood that a limited partner was more like a corporate shareholder (a passive investor) than an active participant in a business enterprise.

In *Morgan*, the Supreme Court looked to the usual distinction between a general and specific power of appointment and concluded that Congress must have had that distinction in mind when it used the adjective "general" notwithstanding a contrary state-law definition. 309 U.S. at 80-82. In this case, the distinctions usually made between a general partner and a limited partner in 1977 were *both* the limited partner's limited liability *and* the limited partner's lack of involvement in the partnership's business.

Despite increasing flexibility in some state statutes, federal courts have continued to refer to limited partners as passive investors. Recently, for example, the Fifth Circuit reaffirmed that limited-partnership interests generally are securities under federal law because

limited partners are passive investors with no active managerial role. *SEC v. Arcturus Corp.*, 928 F.3d 400, 410 (5th Cir. 2019).[9] It only makes sense that Congress had that distinction in mind when it used the adjective "limited" in §1402(a)(13).

#### 2. The statutory purpose, context, and scheme confirm this reading

Moreover, §1402(a)(13)'s purpose and context, and its surrounding statutory scheme, confirm what Congress had in mind. "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).

Consideration of statutory context and purpose here favors the Tax Court's interpretation. Denham acknowledges (Br.7) the limited-

[9] *See, e.g.*, *Foxfield Villa Assocs., LLC v. Robben*, 967 F.3d 1082, 1092 (10th Cir. 2020); *Life Care Centers of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*, 79 F.3d 496, 503 (6th Cir. 1996); *Marin TV Servs. Partners, Ltd. v. FCC*, 993 F.2d 261, 262 (D.C. Cir. 1993); *Marlin Broad. of Cent. Fla., Inc. v. FCC*, 952 F.2d 507, 511 (D.C. Cir. 1992); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989); *Harper v. Del. Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1089 (D. Del. 1990); *In re Adelphia Comms. Corp*, 376 B.R. 87, 93 (Bankr. S.D.N.Y. 2007).

partner exception's anti-abuse purpose to prevent "investor[s]" in limited partnerships from "becom[ing] insured for social security benefits." As we explained at pp.33-36, Congress wanted the self-employed to contribute to Social Security "on the income [they] receive[] for [their] personal services." Packer & Leibowitz, 36 Calif. L. Rev., at 67-68. This reflected Social Security's "underlying purpose": "to provide protection against the loss of earning by reason of old age or death." *Id.* When Congress added coverage for the self-employed, it reaffirmed the principle that "[a] contributory system, in which *both contributions and benefits* are directly related to the individual's own productive efforts, prevents insecurity while preserving self-reliance and initiative." H.R. Rep. 81-1300, at 2 (emphasis added).

But by including every partner's distributive share of ordinary income in "net earnings from self-employment," Congress inadvertently created a "loophole" for limited partners "who merely invest[ed] a certain amount in a business" and "obtain[ed] Social Security coverage without working." (MFA Br., Ex.A.) Qualifying for benefits through investment, and not work, was contrary to Social Security's purpose and "'ha[d] the potential for great inequity to those who contribute to the

system through their work.'" (*Id.* (citation omitted).) It was in that context that Congress enacted §1402(a)(13). Congress meant to exclude from coverage (and from self-employment tax) only individuals who were limited partners as that term was traditionally used—those who were passively deriving income from investment and not from working.

Section 1402's surrounding text drives home this distinction between income from investment and income from work. *See Mellouli v. Lynch*, 575 U.S. 798, 809-10 (2015) ("Statutes should be interpreted 'as a symmetrical and coherent regulatory scheme.'") (citation omitted). Of §1402's seventeen exceptions and adjustments to net earnings from self-employment, many delineate between income from passive-investment activities, which is excluded from net earnings from self-employment, and income from active business activities, which is included. Income from real-estate rentals; stock dividends; and interest on bonds, notes, or other financial instruments "shall be excluded" from net earnings from self-employment, unless that income is earned "in the course of a trade or business as a real estate dealer" or stock or securities dealer. I.R.C. §1402(a)(1)-(2). Gain or loss from "capital asset" sales and from the disposition of property "shall be excluded"

from net earnings from self-employment, unless the latter is inventory or "held primarily for sale to customers in the ordinary course of [a] trade or business." I.R.C. §1402(a)(3)(A), (C). Partnership payments to a retired partner "shall be excluded" from net earnings from self-employment, if "such partner rendered no services" for the "trade or business carried on by [the] partnership[.]" I.R.C. §1402(a)(10).

The throughline of §1402's text is thus clear: income from passive investment is excluded from net earnings from self-employment; income from active efforts in a business is included. The Tax Court's interpretation of the limited-partner exception—constraining it to partners who are not active in the partnership's business—honors that statutory scheme and aligns with the statute's purpose.

**3. The legislative history confirms this interpretation**

Legislative history reaffirms Congress's purpose in enacting §1402(a)(13). *Cf. Morgan*, 309 U.S. at 81 (legislative history confirmed that Congress had "usual distinction" in mind); *Recovery Group, Inc. v. Commissioner*, 652 F.3d 122, 127 (1st Cir. 2011) (resorting to legislative history "to determine congressional intent"). Here, Congress told us why it enacted §1402(a)(13): to prevent "investments in limited

partnerships as a means for an investor to become insured for social security benefits." H.R. Rep. 95-702, at 40-41. Congress was concerned that "the investor in the limited partnership performs no services for the partnership and the social security coverage which results is, in fact, based on income from an investment." *Id.* at 41. That outcome was "inconsistent with the basic principle of the social security program that benefits are designed to partially replace lost earnings from work." *Id.* Congress enacted the exception for limited-partnership interests "to exclude" from coverage "earnings which are basically of an investment nature." *Id.* at 11.

When Congress exempted "limited partner[s], as such" from self-employment taxes, it had in mind passive "investors" who should not participate in a program designed to "partially replace lost earnings from work." *Id.* at 41. Whether they enjoyed limited liability or were a limited partner under state law was not part of Congress's consideration. What mattered was that they were earning Social Security credits for income not derived from their labors. This case is the mirror image: Denham's individual partners pay self-employment tax on a fraction of their earnings despite laboring full-time in

Denham's business. Congress never contemplated that such individuals would be largely excluded from coverage.

### D. The individual partners were active participants in Denham's business

There is no question that Denham's individual partners "operat[ed] Denham's business as self-employed persons," not as passive investors. (ADD18.) To reach this conclusion, the Tax Court homed in on three factors: (1) "the sources of Denham's income"; (2) the individual partners' "role in generating it"; and (3) "the relationship between the [individual partners'] distributive shares and any capital contributions they made to the partnership." (ADD15.)

Under this rubric, the court found that: Denham's income "consisted solely of fees it received in exchange for services provided to investors"; the individual partners' "time, skills, and judgment were essential to the provision of [those] services"; and the individual partners' capital contributions—which for all partners except Porter were $0.00—paled in comparison to their multi-million-dollar distributive shares. (ADD15-16.) It further found that the individual partners "treated their work for Denham as their full-time employment"; "participated in [Denham's] management"; "were a

significant draw for fund investors"; were advertised to such investors as playing a "significant role in Denham's operation"; and "exercised significant control over personnel decisions." (ADD16-17.) In sum, "Denham [could] not exist without" the individual partners who "controlled nearly every aspect of" Denham's operation; accordingly, their distributive shares of Denham's income were net earnings from self-employment. (ADD17-19.)

Denham does not dispute the Tax Court's findings. Rather, it complains that the passive-investor test is "indeterminate and unworkable." (Br.41-43.) Denham's complaints are overblown and reflect its championing of form over substance. Federal tax law requires the opposite. And the passive-investor test reflects the long-standing principle that substance trumps form.

The passive-investor test is straightforward: it examines the partners' economic relationship to the partnership's income—through the partners' role in generating it and the partners' capital contributions to the partnership. The Tax Court has been consistent in this approach. (ADD12-15.) *Renkemeyer, Campbell & Weaver, LLP v. Commissioner*, 136 T.C. 137, 150-51 (2011); *Soroban Cap. Partners LP*

*v. Commissioner*, T.C. Memo. 2025-52, [*17].[10] As the *Soroban* court reiterated: the "economic reality of a partner's relationship with the entity" controls. *Id.* at [*20]. "[A] limited partner who works for the business full time, whose work is essential to generating the business's income, who is held out to the public as essential to the business, and who contributes little or no capital, is not functioning as a limited partner[.]" *Id.*

So too here. Denham doesn't dispute that its partners were not functioning as limited partners; it only puts up the limited-liability shield that attaches to the Delaware-law limited-partner label. (Br.30-31.) While looking behind this label may inject "tax [un]certainty" (Br.42), reliance on labels (or form) has never been the norm in tax law.

To the contrary, the Code is replete with similar substance-focused, factor-based tests that Denham claims cause the death of "tax certainty." Whether an advance is debt or equity (*e.g.*, I.R.C. §§163,

---

[10] Denham's attempt to distinguish *Renkemeyer* falls flat. (Br.43-45.) While *Renkemeyer* involved a different entity (a limited liability partnership), the court did not make its decision on that basis. Rather, it concluded that "the partners' distributive shares *** did not arise as a return on [their] investment and were not earnings which are basically of an investment nature," and were therefore "subject to self-employment taxes." 136 T.C. at 150-51 (internal quotations omitted).

166) turns on "no fewer than eleven non-exclusive factors," *Hewlett-Packard Co. v. Commissioner*, 875 F.3d 494, 498 (9th Cir. 2017). Whether an activity is engaged in for profit (*e.g.*, I.R.C. §§162, 183, 212) turns on "nine factors listed in Treasury Regulation §1.183-2(b)," *Losantiville Country Club v. Commissioner*, 906 F.3d 468, 472-73 (6th Cir. 2018). Whether a taxpayer is an employee (*e.g.*, I.R.C. §3121) turns on seven non-exclusive factors, *Weber v. Commissioner*, 103 T.C. 378, 386-88 (1994) (citations omitted). Whether a transaction is insurance (*e.g.*, I.R.C. §§816, 162) turns on "four criteria," *Swift v. Commissioner*, 144 F.4th 756, 764 (5th Cir. 2025) (citations omitted). The list goes on. *E.g.*, *Keith v. Commissioner*, 115 T.C. 605, 611-12 (2000) (listing seven factors to determine whether property sale is complete). Like the passive-investor test, these tests all tease out the "substance, not form" of disputed transactions and relationships, *Swift*, 144 F.4th at 767 (citation omitted)—a fundamental tenet a federal tax law. The passive-investor test follows in those footsteps.

### E. Denham's and the amici's remaining arguments lack merit

#### 1. There is no conflict between the passive-investor standard and other Code provisions

Denham claims (Br.38-41) that the Tax Court's §1402(a)(13) interpretation conflicts with certain Code provisions. But as we have explained, these provisions reflect Congress's understanding of limited partners as passive investors. This supports, rather than contradicts, the Tax Court's interpretation. In any event, we address Denham's arguments in turn.

**a.** First, we address the limited-partner exception itself. Denham argues (Br.38-39) that two aspects of §1402(a)(13)—the "guaranteed-payments" clause and the existence of partners who are both general and limited partners—show that it accounts for partners who perform services for the partnership. The passive-investor standard, Denham continues, makes these aspects meaningless by treating all partnership income as net earnings from self-employment. Not so.

To be clear: It is not the Commissioner's position—and the Tax Court's interpretation of §1402(a)(13) does not mean—that providing *any* services to a partnership renders the individual not a limited

partner.  Denham's individual partners are at the far end of the spectrum, working full-time as service partners in a partnership that derives all its income from services.  At the far other end of the spectrum are partners who perform no services.  In the middle are individuals who perform *some* services for the partnership but are otherwise uninvolved in the partnership's business.  If those individuals receive no "guaranteed payments," then they do not include their distributive share in self-employment income.  *See Hardy v. Commissioner*, T.C. Memo. 2017-16, [*28-32] (LLC member who performed weekly surgical services at LLC's center, for which he was paid directly by patients, but was uninvolved in LLC business was not subject to self-employment tax on his distributive share).  But if they do receive "guaranteed payments" for those services (I.R.C. §707(c)), then they pay self-employment tax on those payments (I.R.C. §1402(a)(13)), and their remaining distributive share falls under the exception.

But Denham's limited partners worked full-time for the partnership, and Denham failed to show that its guaranteed payments had any connection to the value of its partners' services.  Indeed, the evidence shows the opposite: Denham's guaranteed payments grossly

undervalued its partners' services because over 20 of its lower-level employees were making more in salary than the partners who "controlled nearly every aspect" of Denham's business. (ADD5, 18.) The partners' distributive shares—derived solely from fees for their investment-advisory services—were their compensation. Denham's arguments make the "line that Congress drew" meaningless (Br.39), not the Tax Court.

Denham's dual-status-partner argument founders for similar reasons. It invokes the House Report for the limited-partner exception as evidence that a partner can be both a general and limited partner of the same partnership. (Br.35 (citing H.R. Rep. 95-702, at 40).) But this reflects the then-prevailing distinction between limited and general partners. Limited partners provided capital, were not involved in the business, and had limited liability. General partners ran the business and had unlimited liability. It therefore made sense for a partner to have "dual status" if she wanted to invest in the partnership and meaningfully participate in running it.

While it may technically be true that partners can still have dual status (Br.34-35), it is unclear why they would. State-law limited

partnerships now allow limited partners to maintain limited liability while effectively controlling the partnership, as Denham's partners did. There has been a "progressive reduction of control-based liability" for limited partners. Bromberg & Ribstein on Partnership, §12.14[A] (3d. ed. 2025-2 Supp. 2019). Some states "have done away with it entirely[.]" *Id.* Delaware, for example, has "the most expansive list" of "noncontrol acts" —acts that a limited partner can perform while retaining limited liability. *Id.* at §12.14[L] (footnote omitted); *see* 6 Del. Code Ann. §17-303(b) (West). The Tax Court's interpretation has not rendered the dual-status partner obsolete; state-law changes to provide for ever-increasing involvement and authority for partners under the limited-partner umbrella have. Given this erosion of the need for dual status, the Tax Court correctly applied a functional test to ascertain whether Denham's partners acted as traditional limited partners (*i.e.,* passive investors) or were active participants in the business such that they should be subject to self-employment tax.

**b.** Denham further contends that the "retired-partner" exception to net earnings from self-employment (§1402(a)(10)) and a provision on

"farming syndicates" (formerly, §464)[11] show that Congress knew how to specify what was "truly passive" but did not do so in §1402(a)(13). (Br.40-41.) This "negative implication" argument, however, is context dependent. *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 381 (2013). Context does not support Denham's argument here.

First, both §1402(a)(10) and §464 were enacted at different times than the limited-partner exception, and negative implications "'are strongest' when the provisions were 'considered simultaneously,'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted). As Denham admits (Br.40), §1402(a)(10) was enacted roughly 10 years before §1402(a)(13), and §464 was enacted a year before §1402(a)(13). There is thus little to be taken from the differences in statutory language enacted in different years by different Congresses.

Both §1402(a)(10) and §464 also addressed different issues. Section 464 limited deductions of certain losses by "farming syndicates." Tax Reform Act of 1976, Pub. L. No. 94-455, §207, 90 Stat. 1520. A "farming syndicate" included "a partnership *** if more than 35 percent

---

[11] As Denham notes (Br.40), this provision was codified at I.R.C. §461(j) for the years at issue.

of the losses during any period are allocable to limited partners[.]" *Id.* §207(a) (enacting I.R.C. §464(c)(1)(B)). The statute did not define "limited partners"; it instead specified that an interest *not* "held by a limited partner" included interests held by an individual "who has actively participated (for a period of not less than 5 years) in the management of any trade or business of farming[.]" *Id.* §207(a) (enacting I.R.C. §464(c)(2)). This reflected Congress's desire to disallow these farming deductions by "passive persons similar to limited partners[.]" H.R. Rep. 94-658, at 47 (1975). Section 464(c)(2) thus distinguished genuine farmers from passive investors; it did not recognize that limited partners can actively participate in a business for up to five years, as Denham suggests (Br.41).

The same goes for §1402(a)(10), which excludes from self-employment income payments to retired partners if "such partner rendered no services with respect to any trade or business carried on by such partnership[.]" I.R.C. §1402(a)(10)(A). Under then-existing law, *all* payments to *all* partners from a partnership engaged in a trade or business were subject to self-employment taxes, even if paid as retirement benefits to a partner who was "perform[ing] no services."

H.R. Rep. 90-544, at 35 (1967). Congress felt that "partnership payments [that] are clearly retirement income should be excluded for all social security purposes[,]" so it enacted §1402(a)(10) to "exclude[]" — "under conditions which assure that the payments are bona fide retirement income" — "payments received by a retired partner from the partnership[.]" *Id.* It thus distinguished between payments to a partner for his services versus payments to that partner after withdrawing from service.

The premise of §1402(a)(13), in contrast (*see supra* pp.51-53), was that individuals were obtaining Social Security credits on income that was "basically of an investment nature." H.R. Rep. 95-702, at 11. It would make no sense for Congress to include a rule that, to be a limited partner, the partner must perform "no" services. In that case, investors in partnerships could obtain Social Security credits by performing minimal services, essentially "electing out" of §1402(a)(13). That would defeat Congress's purpose of excluding investment income.

### 2. IRS and SSA publications align with the Commissioner's position

Denham (Br.26-28) and the amici (*e.g.*, MFA Br.12-20) argue that IRS and SSA publications confirm their view of §1402(a)(13). For

example, Denham notes that the instructions to Form 1065 for 1978 and the years at issue (Br.27-28) defined a limited partner as a partner whose potential liability is limited to the amount of his partnership contribution, and instructed that limited partners should treat as net earnings from self-employment only guaranteed payments.

But nothing in those instructions is inconsistent with the Commissioner's position. As demonstrated above (pp.45-51), even under the state laws then in effect, determining whether a state-law-denominated limited partner enjoyed limited liability could require an examination of her role in the partnership. An individual having pervasive involvement in the conduct and management of the business potentially would *not* have limited liability and thus would *not* be a "limited partner" under §1402(a)(13). The Form 1065 instructions simply refer to a limited partner who does not have that level of involvement and thus *is* a limited partner under §1402(a)(13).[12]

The SSA's regulations also support the Commissioner's position. Denham and the amici primarily rely (Br.26; MFA Br.15-17) on 20

---

[12] In any event, "IRS publications do not displace controlling statutes, regulations, and case law." *Gerstenbluth v. Credit Suisse Secs. (USA) LLC*, 728 F.3d 139, 147 (2d Cir. 2013).

C.F.R. §404.1080(b)(3), promulgated under 42 U.S.C. §411(a) (defining net earnings from self-employment for Social Security benefits). Contrary to their suggestions, the regulation itself references the control and services provided by a partner in determining whether she is a limited partner: "Generally, [a limited partner] will not have to perform services in the operation of, or participate in the control of, the business carried on by the partnership for the taxable year involved." 20 C.F.R. §404.1080(b)(3) (second sentence). That is consistent with the Tax Court's functional analysis.

And as the Tax Court has explained, "[t]he concept of 'net earnings from self-employment' used in section 1402(a) provides the standard for determining not only liability for self-employment taxes but also eligibility for social security benefits." *Stevenson v. Commissioner*, T.C. Memo. 1989-357. Where the IRS collects and reports self-employment taxes to the SSA, the SSA credits those payments to calculate benefits eligibility. 42 U.S.C. §405(c)(2)(A). We are unaware of any case where the SSA denied Social Security benefits because a partner who paid self-employment taxes is still a limited partner not entitled to benefits. Even when a question of a limited

partner's benefits eligibility arises, the SSA uses a "Partnership Questionnaire" (Form SSA-7104 (12-2024)),[13] which asks questions parroting the Tax Court's functional analysis.

The SSA's sub-regulatory Program Operations Manual System ("POMS") provides no better support for Denham and the amici's argument. The POMS, like IRS publications, "does not have binding legal force," *Raymond v. Barnhart*, 214 F. Supp. 2d 188, 191 (D.N.H. 2002) (citing *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981)); it "provides nonbinding guidance to SSA employees," *Cooper v. SSA*, 131 F.4th 995, 1004 (9th Cir. 2025) (citation omitted). MFA also asserts (MFA Br.18) that POMS "directly refutes the Tax Court's assertion in *Soroban* that the statutory term 'limited partner' must mean a 'passive investor' who is a 'silent partner' or 'inactive partner.'" But neither the word "silent" nor "inactive" appears in the Tax Court's opinion. *Soroban*, 161 T.C. at 311-25.

---

[13] *See* https://www.ssa.gov/forms/ssa-7104.pdf [https://perma.cc/4CXF-EZZJ].

### 3. Later legislative proposals do not alter §1402(a)(13)'s plain meaning

Amicus Managed Funds Association asserts (MFA Br.20) that "various legislative and administrative proposals to revoke or amend the exclusion from SECA taxation for certain limited partner income" beginning in the 1990s "confirm the contemporaneous understanding that 'limited partner' in section 1402(a)(13) refers to partners with limited liability under state law." But those legislative proposals were *not* "contemporaneous" with §1402(a)(13)'s enactment; they were 20 to 30 years later. The "view of a later Congress cannot control the interpretation of an earlier enacted statute." *O'gilvie v. United States*, 519 U.S. 79, 90 (1996) (citations omitted).

In the same vein, subsequent *proposed* legislation that never passed is entitled to little interpretive weight. *Pension Ben. Guar. Corp. v. LTC Corp.*, 496 U.S. 633, 650 (1990). This is because "'several equally tenable inferences' may be drawn from [congressional] inaction[.]'" *Id.* (citation omitted). Here, for example, the 1993 proposal to replace "limited partner, as such" with "limited partner who does not materially participate in the activities of the partnership" (MFA Br.21 (discussing Health Security Act, H.R. 3600, 103d Cong., §7141 (1993)))

may well have been an effort to clarify what §1402(a)(13) meant all along. Whatever reasons later Congresses had for proposing changes to §1402(a)(13), they say nothing about what the Congress that enacted §1402(a)(13) meant.

#### 4. The 1997 congressional moratorium does not undermine the Commissioner's position

For similar reasons, the congressional moratorium on certain proposed regulations does not inform the meaning of "limited partner" in §1402(a)(13). (*See* Br.28-29 (citing Taxpayer Relief Act of 1997, Pub. L. No. 105-34, §935, 111 Stat. 788, 882).) That temporary moratorium simply provided that no regulations "with respect to the definition of a limited partner under section 1402(a)(13)" could be issued or effective before July 1, 1998. *Id.* The Senate's non-binding "Sense of the Senate" Resolution contended that the proposed regulations "would effectively change the law administratively without congressional action," but it added that the proposed regulations were an "attempt to address owners of" entities like "limited liability companies and limited liability partnerships," which "were not widely used" when §1402(a)(13) was enacted. 143 Cong. Rec. S6694 (daily ed. Jun. 27, 1997). At all events, the Senate's concern with regulations 20 years after §1402(a)(13)'s

enactment does not override the statute's plain text or Congress's original intent.

**CONCLUSION**

For these reasons, the Tax Court's decision was correct and should be affirmed.

Respectfully submitted,

/s/ *Samuel P. Jones*

ELLEN PAGE DELSOLE (202) 514-8128
*Court of Appeals Bar. No.* 71201
SAMUEL P. JONES (202) 616-9085
*Court of Appeals Bar No.* 1197266
*Attorneys*
*Tax Division*
*U.S. Department of Justice*
*Post Office Box 502, Washington, D.C. 20044*

NOVEMBER 26, 2025

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X] this document contains 12,968 words, **or**

[ ] this brief uses a monospaced typeface and contains _____ lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Century Schoolbook 14, **or**

[ ] this brief has been prepared in a monospaced typeface using ____________________ with ________________.

(s) /s/ *Samuel P. Jones*
Attorney for Scott Bessent, Acting Commissioner, Internal Revenue Service
Dated: November 26, 2025